THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION



| | | |
|---|---|---|
| MARATHON FINANCIAL INSURANCE INC. RRG, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. __5 0 5 C V__  · 1 6 |
| FORD MOTOR COMPANY, FORD MOTOR CREDIT COMPANY, PRIMUS FINANCIAL SERVICES, FORD EXTENDED SERVICE PLAN, FORD MOTOR SERVICE COMPANY, AMERICAN ROAD INSURANCE COMPANY, and AUTOMOBILE PROTECTION CORPORATION, | § § § § § § § § § | JURY |
| Defendants. | § § | |

## ORIGINAL COMPLAINT AND
## APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIONS

Marathon Financial Insurance Inc. RRG ("Marathon") files its Original Complaint and

Application for Preliminary and Permanent Injunctions against Ford Motor Company ("Ford"),

Ford Motor Credit Company ("FMCC") and Primus Financial Services ("Primus") ("collectively

as "Ford Credit"), and Ford Extended Service Plan, Ford Motor Service Company, American

Road Insurance Company and Automobile Protection Corporation (these four Defendants

collectively as "Ford Insurance") as a result of Defendants' attempts to monopolize the extended

warranty market for Ford vehicles purchased from Ford's authorized dealers and financed by

Ford Credit.  Defendants are engaging in anticompetitive conduct such as predatory pricing,

bundling, tying, exclusive dealing, and monopoly leveraging in order to foreclose Marathon from

competing against Ford Insurance.  Defendants have also knowingly made numerous false

statements about Marathon and its financial viability and are acting to interfere with Marathon's

current and future contracts.  Marathon has already suffered irreparable harm to its reputation and loss of goodwill with its current and prospective customers due to Defendants' slanderous acts, and it already has lost customers due to Defendants' tortious interference with its current contracts.  If Defendants are not stopped immediately, these injuries will only increase. Moreover, Marathon has incurred economic damages as a result of these actions, and, if they are allowed to continue, Marathon's economic damages also will increase.  Ultimately, too, if Defendants are not stopped, the market will also suffer irreparable harm.  Accordingly, Marathon files this action against Defendants for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, common law tortious interference with current and prospective contracts, slander per se, and business disparagement, and would show as follows:

## I. PARTIES

1.      Marathon is a federally chartered Risk Retention Group ("RRG").

2.      Ford Motor Company is a Delaware corporation with its principal place of business at One American Road, Dearborn, Michigan 48126.  Ford Motor Company is registered to do business in the State of Texas, and may be served through its registered agent for service, CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.

3.      Ford Motor Credit Company is a Delaware corporation, and is a subsidiary of Ford Motor Company, with its principal place of business at One American Road, Dearborn, Michigan 48126.  Ford Motor Credit Company is registered to do business in the State of Texas, and may be served through its registered agent for service, CT Corporation System, 350 N. St. Paul Street, Dallas, Texas, 75201.

4.      Upon information and belief, Ford Extended Service Plan is a Delaware corporation with its principal place of business at P.O. Box 6045, Dearborn, Michigan, 48121.  It does business as

2

American Road Insurance and American Road Services Co.  Ford Extended Service Plan is not registered to do business in the State of Texas, and not required to maintain a registered agent for service in Texas.  Ford Extended Service Plan can be served with process through the Texas Secretary of State under the Texas Long-Arm Statute, TEX. CIV. PROC. & REM. Code § 17.041.

5.     Ford Motor Service Company is a Michigan corporation, and is a subsidiary of Ford Motor Company, with its principal place of business at 16800 Executive Plaza Drive, One American Road, Dearborn, Michigan.  Ford Motor Service Company is registered to do business in the State of Texas, and may be served through its registered agent for service, CT Corporation System, 350 N. St. Paul Street, Dallas, Texas, 75201.

6.     Upon information and belief, American Road Insurance Company is a Delaware corporation with its principal place of business at One American Road, Dearborn, Michigan 48121.  It may be served with process through its registered agent for service, C.T. Corporation System, 350 North St. Paul Street, Dallas, Texas 75201.

7.     Upon information and belief, Automobile Protection Corporation ("APCO") is a Delaware corporation, and is a subsidiary of Ford Motor Company, with its principal place of business at 6010 Atlantic Boulevard, Norcross, Georgia 30071.  APCO does not maintain an agent for service of process in Texas, and may be served through the Texas Secretary of State under the Texas Long-Arm Statute, TEX. CIV. PROC. & REM. Code § 17.041.

## II. JURISDICTION AND VENUE

8.     This action is brought seeking preliminary and permanent injunctions ordering Defendants to cease their violations of the United States antitrust laws and other illegal conduct, which have caused and will continue to cause irreparable injury to Marathon's business reputation and property, and to recover actual monetary damages, appropriately trebled, to the extent suffered.  Marathon also asserts a cause of action against Defendants for tortious

3

interference with existing contracts, tortious interference with prospective relations, and slander per se and business disparagement, seeking recovery of both actual and exemplary damages. Marathon also seeks recovery of its costs, experts' fees, and attorneys' fees.

9.      This Court has subject matter jurisdiction over this complaint pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Sections 3, 4 and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15 and 26, and 28 U.S.C. §§ 1331, 1337 and 1367.

10.     This Court has personal jurisdiction over Defendants because this action is based on their commercial activities conducted in Texas, including within Bowie County, and elsewhere throughout the United States, which have had and will have a substantial, direct and reasonably foreseeable effect on business and commerce in Texas and in interstate commerce.

### III. TRADE AND COMMERCE AND RELEVANT MARKET

11.     The conduct of the Defendants described in this Complaint affects interstate trade and commerce.  Defendants' collective annual revenues through the sale and financing of Ford vehicles and issuing and insuring of extended warranty service contracts ("extended warranties") on Ford vehicles are measured collectively in the billions of dollars.

12.     An extended warranty is a contract that consumers purchase to extend the warranty for their cars beyond the primary term of the manufacturer's warranty.  Over 16,000,000 cars are sold each year in the United States.  Ford sells cars under the various automotive makes that Ford owns, including Ford's own traditional brands—Ford, Lincoln, Mercury—and others owned by Ford such as Lincoln, Mercury, Land Rover, Jaguar, Aston Martin, Mazda, and Volvo (collectively "Ford vehicles").  Statistically, approximately 50% of the purchasers of these Ford vehicles also buy extended warranties.  At an average price of $1,700.00 per contract, the entire extended warranty industry generates approximately $8 billion in revenue each year.  Under any calculations, revenues attributable to extended warranties for Ford vehicles are significant.

HOUSTON: 022169.00001: 977527v8

Defendants' vehicles and extended warranties are sold, financed and insured throughout the United States, including Texas.

13.     The relevant product market impacted by Defendants' anticompetitive conduct is the market for extended warranties for vehicles purchased from Ford authorized dealers, including dealers of Ford-brand vehicles and dealers of Ford-owned automobile brands including Mazda, Aston Martin, Lincoln, Mercury, Land Rover, Jaguar, and Volvo ("the extended warranty market").

14.     As a result of Defendants' anticompetitive conduct, Marathon will not be able to insure extended warranties sold through dealers of Ford vehicles.  This will result in higher prices charged to consumers.   Moreover, as a result of Defendants' actions, this market will be foreclosed in favor of Ford Insurance.  Consequently, Marathon will suffer significant economic damages.  In addition, Defendants' violations of the antitrust laws have begun and will continue to foreclose Marathon and others like it from the market for extended warranties for Ford vehicles financed through FMCC, providing Ford Insurance with a monopoly in the relevant market.

15.     The geographic market is the United States.

## IV. FACTS

### A.     The Extended Warranty Market.

16.     Extended warranties provide additional warranty coverage to automobiles after the original manufacturer's factory warranty ceases.  These warranties are transferable if the car changes owners.  These extended warranties are purchased from the vehicle dealer, often at the time of the vehicle's purchase.  The dealer, in turn, has purchased the extended warranty for a set price from a warranty provider.  The price of the extended warranty charged by the vehicle dealer to the consumer is typically at a price that covers the dealer's purchase price paid to the

5

warranty provider, plus a significant mark up.  The sale to the consumer is at a price that covers the dealer's cost and adds some profit.

17.     For example, a consumer who purchases a new Ford F-150 pick-up truck receives a standard warranty of three years or 60,000 miles, whichever milestone is reached first.  A consumer has the option of purchasing an extended warranty for an additional term of years and/or miles, effectively ensuring warranty coverage for a total of up to an additional 3 years or 50,000 miles beyond the original manufacturer's factory warranty.  At the closing of the vehicle sale, the dealer will offer the consumer a chance to buy an extended warranty for an average price of $1,700.00.  If the consumer purchases the extended warranty, the cost is rolled into the principal of the vehicle loan and financed for the life of the loan.  Thus, the consumer has the benefit of paying for the extended warranty over time.  If the consumer does purchase the extended warranty, the dealer will, in turn, purchase it from a warranty provider.  On average, the dealer cost does not exceed $750.00.

18.     On information and belief, extended warranties are inelastic because of the basic needs they fulfill.  For example, consumers might purchase extended warranties because they are unable, or expect to be unable, to cover the cost of repairs to the vehicle outside of the original manufacturer's factory warranty.  Consumers may also purchase extended warranties for the added protection and certainty that extended warranties provide.  Consumers also like the protection that the extended warranty provides against less scrupulous repair shops.  The warranty provider, which often also acts as a claims administrator, reviews submitted claims to ensure that the work being performed is indeed necessary.  Because of the myriad reasons a consumer may purchase an extended warranty, any price increase will not affect demand,

HOUSTON: 022169.00001: 977527v8

especially if the consumer can finance the extended warranty at the time of the vehicle purchase and pay 0% interest on the extended warranty over the life of the loan.

**B.    The Nature of the Extended Warranty Market for Ford-Owned Vehicle Lines.**

19.    Extended warranties are offered by three types of providers:  (1) vertically integrated providers such as Ford Insurance; (2) standard insurance companies such as Travelers or Hartford; and (3) provider teams comprising an RRG and a service contract provider.  A vertically integrated provider acts as insurer and claims administrator.  Marathon is one of approximately 30 RRGs in the United States that is not vertically integrated and has teamed up with a service contract provider to offer these extended warranties.

20.    All RRGs are federally chartered and must meet strict requirements for holding in trust enough reserves to pay claims.  Funds held by an RRG in trust are some of the safest and most secure in the extended warranty business.

21.    On information and belief, the combined market share of the 30 RRGs insuring extended warranties for Ford vehicles is less than 20%.  The market share of the insurance companies who offer extended warranties to Ford vehicles is also less than 20%.  Ford Insurance, therefore, has over 60% of the market for extended warranties for Ford vehicles.  If Defendants' plan succeeds, the number of competitors in this market will shrink instantaneously from approximately 36 to only a handful.  And, of the remaining, only Ford Insurance will have the benefit of the coercive incentives detailed herein to steal any consumers from the other remaining competitors and end competition in the relevant market completely.

22.    Ford's dealerships (of all Ford-owned brands) are almost exclusively independently owned and operated, and each has a choice as to what type of extended warranties it will offer.  Currently, each dealer has the opportunity to select extended warranties from any warranty

provider offering such a product.  These entities all compete with each other on price, service (e.g., speed of claims processing), and other issues in order to win a contract from any particular dealer.

23.     Currently, Marathon has teamed with Automotive Professionals, Inc. ("API") to offer extended warranties.  Marathon sells insurance products to API.  API, in turn, sells extended warranties to vehicle dealers, who sell them to consumers.  API enters into contracts with the various dealers through its extensive network of experienced agents.  Dealers who select API's extended warranties sell the extended warranties to their customers, and API acts as claims administrator under the extended warranties.  API currently has contracts with dealerships throughout the United States for extended warranties.

24.     When a dealer sells a Marathon insured extended warranty issued by API, it keeps its profits from the sale and sends a significant portion of the consumer-paid purchase price to a reserve account jointly controlled by Marathon and API, i.e., neither is able to unilaterally control such account or deposited funds (the "Reserve Account").  The Reserve Account is used to pay claims as made.  If covered repairs are required, funds from the Reserve Account are used to pay for the repairs.  For each extended warranty it sells, API pays a premium to Marathon for its insurance services.  A portion of each such premium paid to Marathon is held in trust as a part of Marathon's unilateral reserves as required by federal insurance regulations covering insurance companies and RRGs.  Marathon's unilateral obligation to provide funds for covered repairs arises only in the event that the amount held in the Reserve Account allocable to an extended warranty has been depleted.  Marathon is, in turn, reinsured through Swiss Reinsurance Company, which is rated "A++" by A.M. Best and AAA by Standard & Poors.  Currently, Marathon has on reserve sufficient funds to cover its liability for currently issued extended

8

warranties. Notably, once each extended warranty period has expired, almost all of the remaining funds allocable to the extended warranty in the Reserve Account are paid to the dealer. Ford Insurance does not pay any leftover reserves to the dealer—it keeps those funds as profit.

25.     Marathon's current contract with API is in full force and effect and automatically renews in June of 2005. Marathon has been under contract with API for over four years and has every reason to believe this contract will be renewed, absent outside interference from Defendants here. Also, API's contracts with the dealers are all currently in full force and effect, and will extend beyond February 15, 2005 absent outside interference from Defendants. Likewise, API's contracts with its agents who solicit and service accounts with dealers are in full force and effect, and will extend beyond February 15, 2005, absent outside interference from Defendants.

> **C.     Ford's Monopoly Power in Financing Its Vehicles and the Need for Extended Warranties.**

26.     Importantly, on information and belief, the vast majority—at least 80%—of Ford vehicles purchased at this time are financed through Ford Credit. This is occurring because of the "0%" financing deals offered by Ford Credit to entice consumers to purchase Ford vehicles. Currently, Ford Credit is offering 0% financing on Ford vehicles for up to 60 months and 2.9% financing on Ford vehicles financed for 72 months. These terms are far better than that available from any financial institution. Moreover, because Ford Credit is offering no cost financing, deciding to finance the purchase through Ford Credit arguably is a better financial decision than paying cash. Given that Ford's new vehicle manufacturer's factory warranty expires at most in 36 months, the need for an extended warranty becomes apparent, especially if a consumer finances a car for longer than the manufacturer's factory warranty.

27.     Dealers will not do anything to jeopardize their ability to offer 0% financing through Ford Credit.  To do so, would cut off the flow of the majority, if not all, of the consumers interested in purchasing new Ford vehicles.  Defendants know this and, as explained below, have used this to attempt to monopolize the market.

> **D.     Defendants Engage in Anticompetitive Actions in an Attempt to Monopolize the Extended Warranty Market.**

28.     On February 15, 2005, Ford Credit will implement a policy that prohibits its Ford dealers from offering an extended warranty on any Ford vehicle financed by Ford Credit—essentially every vehicle sold—UNLESS that extended warranty is issued and insured through Ford Insurance, an insurance company, or a warranty provider that obtains insurance coverage from an insurance company or RRG with an A.M. Best Company rating of "A-" or better.   RRGs are typically unable to obtain such a rating because they only offer a discrete line of insurance for a defined and limited population of insureds because A.M. Best Company prefers to rate only insurance companies that offer more varied lines of insurance.   Not surprisingly, no RRG currently offering insurance to warranty providers has any rating at all from A.M. Best Company.  Consequently, the practical outcome after February 15, 2005 is that dealers will no longer offer extended warranties from any warranty provider relying on RRG insurance products.

29.     Even though Ford purportedly will allow dealers to offer extended warranties insured by "A-" rated insurance companies and RRGs (though none currently exist), the practical reality is that all dealers will switch to Ford Insurance.   This is because Ford is bundling other benefits together with this new program in order to capture and control the market for extended warranties for Ford vehicles.

10

30.   Ford's biggest coercive tactic in forcing dealers to switch to Ford Insurance is the tie and/or bundle of the extended warranty with Ford Credit's 0% financing.  While it is true that a dealer could offer a consumer an extended warranty insured by a non-rated insurance company or RRG, the dealer would not be able to offer that consumer 0% financing through Ford Credit. As explained above, such a result would completely undermine the dealer's ability to sell any Ford vehicles because consumers are drawn to the 0% financing offer.  Without the ability to offer 0% financing through Ford Credit, a dealer would not be able to compete in the marketplace.  Tying the extended warranty to the 0% financing effectively guarantees that every dealer will start offering extended warranties exclusively from Ford Insurance.

31.   Couple this coercion with the additional "incentives" Ford offers to dealers if they choose Ford Insurance over an "A-" rated insurance company, and the extent of the anticompetitive plan to monopolize the relevant market becomes abundantly clear.  For dealers that agree to sell Ford Insurance's extended warranties, Ford provides expanded allocation and rushed delivery of "hot" selling Ford vehicles for a particular model year.  As a result, participating dealers will have a bigger and quicker inventory of "hot" cars than dealers who decide to sell non-Ford Insurance extended warranties.   This will put non-participating dealers at a further disadvantage and ultimately force those dealers to switch to Ford Insurance's products.   Second, Ford offers participating dealers price breaks on floor plan financing and dealer financing of new cars.  On information and belief, these price breaks are significant and, taken in a bundle with the other incentives and the price of the extended warranties, result in Ford Insurance selling the extended warranty to dealers at below cost.

32.   Given Defendants' anticompetitive acts, a dealer would never select an "A-" rated insurance company or an "A-" RRG over Ford Insurance because the bundle of incentives

11

offered by Defendants to use Ford Insurance is so significant.  Indeed, dealers would be at an extreme competitive disadvantage if they were to offer extended warranties insured by a non-rated RRG (or even from an "A-" rated insurance company) instead of Ford Insurance.  The reason these incentives are so significant is because they are predatory and anticompetitive, with the goal of driving Marathon and others like it from the relevant market and preventing reentry, thus providing Ford Insurance with a monopoly in this market.

33.      To make a bad situation worse, Ford Insurance is demanding exclusive contracts with participating dealers.  So, even if an RRG were to obtain an "A-" rating, the existence of these exclusive contracts would make regaining access to the market after a dealer had already switched practically impossible.  Dealers will be reluctant to switch not only because of the high cost in terms of both time and money involved in switching, but also because of the loss of the bundled incentives from Defendants.  Further, dealers will not wish to end a relationship with Ford Insurance because of the time, money, and effort already invested in establishing a relationship with Ford Insurance and acclimating to its system.  In other words, once the dealers switch to Ford Insurance, the chances of them switching back to any other warranty provider are nearly zero.

**E.      There is No Legitimate Business Reason for Defendants' Conduct.**

34.      Defendants' pretense is that they want to ensure that consumers have extended warranties with reputable, financially viable warranty providers.  Defendants' actions belie their true intentions.  When Ford Credit announced its policy, Marathon immediately responded with a wealth of financial information requested by Ford Credit documenting its financial strength, the reserve account, Marathon's fully-funded trust reserves maintained in compliance with Federal law and other information requested by Ford Credit, in an attempt to mitigate this dispute.  Ford completely disregarded all of this information and never responded to Marathon's submissions.

12

Marathon also offered additional security in the form of a letter of credit.  Ford Credit rejected this offer out of hand.  Marathon offered to demonstrate, therefore, not only that Marathon itself held the money required by federal law, but, furthermore, that the security of the Reserve Account is protected by good financial strength and good business practices by API.  Marathon even sent evidence of reinsurance of its risk—an even further layer of assurance that claims would be paid.  A company that truly cared about whether reserves would be available to pay all legitimate claims would never have rejected such proof as Marathon provided to Ford Credit.  But a company whose only goal was to monopolize would—and did.

35.     Why are Defendants engaging in such illegal conduct under the guise of protecting the consumer?  Because they cannot compete otherwise.  When one compares Ford Insurance's extended warranty to that insured by Marathon, it is clear that Defendants could not gain market share absent these anticompetitive acts.  Marathon's insured extended warranties are cheaper and the services provided are more quickly provided, more efficient and with less waste than those of Ford Insurance.  Marathon's product also results in payments back to dealers at the end of an extended warranty period.  Ford Insurance's products do not.  Ford Insurance's product is worse for dealers and consumers, and Ford's policy seeks to eliminate all competition with Ford Insurance on price, service, or any other basis.  Ford's policy is a naked restraint of trade.

**F.      Defendants' Slander and Disparagement of Marathon and the Other RRGs.**

36.     Marathon has been made aware that Ford Insurance employees, as they coerce dealerships to switch from Marathon or other RRGs, have been claiming that Marathon and other RRGs are on the verge of bankruptcy, will not be able to cover claims filed by warranty holders, and generally cannot be trusted.  These claims are not true, and Ford Insurance and its employees know it.  Indeed, Marathon sent Ford Credit proof of its financial health and offered to further guarantee its financial strength with a letter of credit.  Furthermore, Ford Insurance is well aware

13

that RRGs, and Marathon in particular, are federally chartered and are subject to strict trust requirements for their reserves as required by federal law. The claims of Defendants' agents, therefore, are untrue and are being made with the intent to injure Marathon's business, and to entice dealers into breaching their contracts with the agents for API. Ford Insurance has, furthermore, been using this line of slander to attempt to steal the trained agents of API, further undermining the ability to compete with Ford Insurance. As a result of these actions, Marathon is now suffering and will continue to suffer irreparable injury to its reputation and goodwill in the market. Marathon has lost contracts with dealerships due to Ford Insurance's tortious actions.

37.     In addition, Defendants have already coerced some dealers to switch before the deadline for implementation of Ford Credit's policy. As explained above, once these dealers switch, it is highly unlikely that they will switch back. Defendants must be stopped now from inflicting even further injury on Marathon.

## V.  IMPACT ON COMPETITION

### A.     Defendants' Conduct Will Eliminate Choice and Lead to Higher Prices.

38.     Defendants' actions will eliminate competition in the market for extended warranties for buyers of Ford vehicles. Specifically, Defendants' actions remove at least 30 competitors from the relevant market immediately. In addition, through the use of bundled incentives, Defendants will eliminate any remaining competition by effectively ensuring that all dealers choose to offer Ford Insurance's extended warranties instead of the extended warranties offered by any other possible provider or insurer. As a result, Ford Insurance will obtain a monopoly in the relevant market.

39.     The drastic negative impact on competition has injured and will injure Marathon, which will no longer derive revenue from providing insurance services in the extended warranty market

14

for Ford vehicles. Further, the lack of competition will hurt dealers, who will lack the choice needed to select the best, lowest-cost extended warranty product for their consumers. The consumers would not escape either because they would be left with the highest priced, poorest quality extended warranty product.

## VI. CAUSES OF ACTION

### A.    Section 2 of the Sherman Act—Attempted Monopolization.

40.    Marathon incorporates the facts and allegations in paragraphs 1 through 39 herein as if fully set forth.

41.    Defendants have specifically intended, and continue to intend, for their conduct to exclude competitors and destroy competition in the relevant market for extended warranties for Ford vehicles. By use of the following anticompetitive acts, Defendants have attempted to gain monopoly power in this market.

#### 1.    Tying.

42.    Defendants have a monopoly in the financing of its vehicles due to its 0% financing deals and cash back offers. On information and belief, Ford Credit controls in excess of 90% of the market to finance Ford vehicles. In order to increase its market share in the extended warranty market, Defendants have tied Ford Insurance's products to vehicle financing issued by Ford Credit. As a result of this tying, Marathon is foreclosed from the relevant market.

#### 2.    Monopoly Leveraging.

43.    Defendants are illegally leveraging Ford Credit's monopoly in financing of Ford vehicles to force dealers and consumers to purchase Ford Insurance's products in the extended warranty market. With this program in place, if a consumer wishes to finance a vehicle through Ford Credit, and also wishes to purchase an extended warranty, the consumer will have no choice but to buy the extended warranty from Ford Insurance. If the consumer wished to purchase an

15

extended warranty from some other company, such as an extended warranty insured by Marathon, the consumer would be forced to forego the benefits of 0% percent financing and/or substantial "cash back" allowances.

44.     Dealers are equally impacted. If a dealer chooses to offer other than Ford Insurance's extended warranties, it will not be able to offer consumers Ford Credit's 0% financing. That will drastically reduce the dealer's ability to sell Ford vehicles. It will have no choice but to buckle under Defendants' coercive and anticompetitive tactics.

### 3.     Bundling/Predatory Pricing.

45.     Defendants are bundling lucrative incentives to entice dealers to select Ford Insurance as their extended warranty provider. For example, Ford is offering discounts on floor plan financing and dealer purchase contracts. All of these enticements allow a dealer to increase its profitability over other Ford dealer competitors who do not choose Ford Insurance and receive these bundled discounts. Moreover, the bundled discounts more than offset the dealer's cost to purchase the extended warranty from Ford Insurance in order to sell it to consumers. Furthermore, Defendants have bundled their successful 0% financing with these extended warranties. A consumer will not buy a Ford vehicle from a dealer if he cannot obtain the 0% financing deal. The dealer will have no choice but to breach its contract with Marathon's warranty provider, API, and comply with Defendants' anticompetitive demands.

### 4.     Exclusive Dealing.

46.     Ford Insurance has conditioned its bundled incentives to dealers on the dealers entering into exclusive contracts with it for extended warranties. The switching costs and inefficiencies that arise from switching contracts practically eliminate a dealer's willingness to later switch away from Ford Insurance. The purpose of this arrangement is to guarantee that Ford Insurance will face no competitors in the extended warranty market.

16

### 5.    Employee Raiding

47.    Defendants have engaged in a concerted effort to hire agents that currently market to and service Marathon insured extended warranties.  Defendants engaged in this effort with the specific intent to deny to Marathon and its extended warranty provider the agents and relationships necessary to conduct their business and compete with Ford Insurance.  The purpose of these actions is to guarantee that Ford Insurance will face no competitors in the extended warranty market.

### 6.    Common Law Torts.

48.    As part of its campaign to acquire a monopoly share in this market, Defendants have engaged in a slander and disparagement campaign regarding Marathon and the other RRGs' viability, financial stability, and ethics.  Such actions are anticompetitive because they have the intent and the result of driving dealerships away from Marathon and its insured extended warranties.

49.    Defendants' predatory and anticompetitive conduct presents a dangerous probability that Ford Insurance will succeed in monopolizing the extended warranty market for Ford vehicles because Ford Insurance already has market power in the extended warranty market and Ford Credit already has monopoly power in the automobile finance market for Ford vehicles. Further, Defendants are part of a large, diversified automobile conglomerate that can withstand and recoup any short term losses that might result from its predatory conduct in order to reap the long-term benefits of monopoly price increases in extended warranties.  Defendants' bundled incentives to dealers coupled with their long-term exclusive arrangements for extended warranty service forecloses other competitors for the short and long term.

50.    Marathon has suffered and will continue to suffer irreparable harm and economic damages if Defendants' new policy is implemented and if Defendants are allowed to continue

17

with the foregoing acts in their attempt to monopolize the extended warranty market for Ford vehicles. Moreover, both Marathon and the market will suffer irreparable harm if Defendants' current actions are not discontinued immediately.

**B.     Section 1 of the Sherman Act.**

51.     Marathon incorporates the facts and allegations in paragraphs 1 through 50 herein as if fully set forth.

52.      Defendants are using their monopoly power in Ford vehicle financing and their market power in the extended warranty market to organize and enforce a group boycott in violation of the Sherman Act to exclude Marathon from the extended warranty market. Defendants are conspiring with the dealers to keep Marathon from having access to this market. Defendants are using their market power to threaten and coerce the dealers to accept exclusive dealing contracts, and then to threaten them with reprisals, such as loss of significant incentives, if they do not select Ford Insurance as their extended warranty provider. Defendants will be able to enforce this illegal boycott through the power of its bundled incentives and 0% financing, which brings customers and higher profits to participating dealers. Defendants' purpose and intent in orchestrating this boycott is to exclude Marathon from the relevant market and, indeed, to drive Marathon from this market. Defendants' behavior in combination with the dealers constitutes a concerted refusal to deal and/or group boycott in violation of Section 1 of the Sherman Act. As a direct and proximate result of Defendants' unlawful conduct, Marathon has suffered lost sales and profits and will be foreclosed from insuring extended warranties and from dealers, which Marathon needs in order to compete. If Defendants' behavior is not enjoined, Marathon will continue to suffer irreparable harm.

18

C.    **Exclusive Dealing in Violation of Section 3 of the Clayton Act.**

53.    Marathon incorporates the facts and allegations in paragraphs 1 through 52 herein as if fully set forth.

54.    As alleged above, Ford Insurance has made its contracts with participating dealers exclusive.  Such exclusive arrangements foreclose the market from Marathon and any other potential competitor.  As a result, Ford Insurance has substantially lessened competition in the extended warranties market, tending to create a monopoly in favor of Ford Insurance in this market.

55.    Marathon has been and will continue to be directly and proximately harmed by the loss of sales and profits resulting from Defendants' exclusive dealing arrangements.  Marathon will be irreparably harmed if Defendants' exclusive dealing arrangements are not enjoined.

D.    **Tortious Interference with Both Existing and Prospective Contracts and Business Relations.**

56.    Marathon incorporates the facts and allegations in paragraphs 1 through 55 herein as if fully set forth.

57.    Defendants have tortiously interfered with Marathon's existing contract with API and any prospective contractual relationship with API, and contracts with consumers who would have purchased a Marathon insured extended warranty.  Defendants have tortiously interfered with Marathon's existing business relationship with the agents who sell to and service Marathon's customers in the relevant market.  Defendants' illegal actions were malicious, willful and intentional, and specifically designed to damage Marathon to drive it out of the market.  As a result, Marathon has incurred and continues to incur irreparable injury and damages arising from Defendants' illegal actions.  Defendants have no justification or privilege for interfering with any of these contracts or relationships.

**E.    Defamation—Slander Per Se and Business Disparagement.**

58.    Marathon incorporates the facts and allegations in paragraphs 1 through 57 herein as if fully set forth.

59.    Defendants have engaged in actions that are slanderous per se.  They have made numerous false statements about Marathon and the other RRGs, claiming that they are on the verge of bankruptcy and will not be able to cover claims filed by warranty holders, and/or generally cannot be trusted, and will not be able to service any customer who purchases an extended warranty from them.  As part of this campaign of slander, Defendants have told dealerships that Marathon would not provide Ford Credit with information regarding Marathon's financial status when asked to do so, implying that Marathon is insecure and trying to hide its financial status.  These statements are false and Defendants knew these statements were false, or acted with reckless disregard for the truth, when it made them.  Indeed, these statements were maliciously made for the sole purpose of injuring Marathon's reputation and driving business away from it.  Marathon has been injured in its business by Defendants' false and slanderous statements.

## VII. DAMAGES

60.    Marathon incorporates the facts and allegations in paragraphs 1 through 59 herein as if fully set forth.

61.    Marathon has been injured in its business or property as a result of Defendants' violations of the Sherman Act, Clayton Act and tortious behavior alleged herein; for example, as a result of Defendants' conduct, Marathon has lost and will continue to lose customers and sales.  Marathon seeks to recover the lost profits it would have earned but for Defendants' actions to date, and seeks its future lost profits that it would have earned but for Defendants' implementation of this anticompetitive scheme to gain control of the relevant market.

20

62.   Marathon seeks trebling of damages actually incurred, or reasonably expected to be incurred, in light of Defendants' conduct, pursuant to the Clayton Act, and punitive damages as a result of Defendants' tortious acts.

## VIII.  PRELIMINARY INJUNCTION

63.   Marathon incorporates the facts and allegations in paragraphs 1 through 62 herein as if fully set forth.

64.   Defendants' actions are a violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act.   Under Section 16 of the Clayton Act, this Court has the power to enjoin antitrust violations in order to protect and preserve competition.  Here, Marathon is entitled to an injunction to halt Defendants' illegal conduct in the relevant market.  Moreover, injunctive relief serves the public interest in this case because the public has an interest in competitive markets and because access to Marathon's products will lower the cost of extended warranties.   The injury to Marathon if an injunction does not issue far outweighs any potential damage that this relief might cause to Defendants.

65.   Defendants' violations are continuing and will continue despite this action.  Defendants have indicated at every juncture that they intend to and will implement this plan.  Marathon has suffered and is threatened with continued irreparable harm from these continuing and future antitrust violations.   Given the immediate and drastic negative impact on competition Defendants' new program will have, this Court must enter an injunction, preliminarily halting implementation of this program, and ordering Defendants to cease their tortious, slanderous activities, described herein.

HOUSTON: 022169.00001: 977527v8

## IX. PRAYER

Wherefore, premises considered, Marathon prays for judgment as follows:

1.    Enjoining Defendants from continuing the predatory conduct, tying/bundling, exclusive dealing, monopoly leveraging, and other anticompetitive conduct alleged in this Complaint;

2.    Ordering Defendants to take corrective steps to end the foreclosure and distortions of the relevant market created by Defendants' illegal conduct, and maintain a competitive market for extended warranties;

3.    Awarding Marathon its lost profits as damages resulting from Defendants' antitrust violations;

4.    Awarding Marathon both actual and punitive damages as a result of Defendants' malicious, tortious interference with Marathon's current and prospective contracts;

5.    Awarding Marathon its costs and expenses in this action including reasonable attorneys' fees, expert fees, and other costs and pre-and post-judgment interest as appropriate; and

6.    Granting all such other relief, at law or equity, to which Marathon may be entitled.

HOUSTON: 022169.00001: 977527v8

Respectfully submitted,

Nicholas H. Patton
State Bar No. 15631000
PATTON, TIDWELL & SCHROEDER, LLP
4605 Texas Boulevard
P. O. Box 5398
Texarkana, Texas 75505-5398
(903) 792-7080
(903) 792-8233 (fax)

ATTORNEY-IN-CHARGE FOR PLAINTIFF
MARATHON FINANCIAL INSURANCE INC.
RRG

OF COUNSEL:

LOCKE LIDDELL & SAPP LLP
Janet E. Militello
State Bar No. 14051200
Gregory J. Casas
State Bar No. 00787213
3400 JPMorgan Chase Tower
600 Travis Street
Houston, Texas 77002
(713) 226-1200
(713) 223-3717 (fax)

23